## WARREN HUNT *versus* OLIVER HUNT *et al.*

The owner of land mortgaged it to V, in 1803, but continued in possession. In January, 1810, he made a deed of the same land to A, and in March, 1810, he made a deed of it to T. The mortgagee, in 1812, conveyed the land to T, by a deed of quitclaim, in the usual form, with a covenant of warranty against himself and any person claiming under him. It was *held,* that this conveyance to T, who had taken from the mortgager the second deed of the equity of redemption, did not operate as an extinguishment or merger of the mortgage, so as to give a priority to A, but that it operated as an assignment of the mortgage.

The erection of buildings on mortgaged premises, by the mortgager while remaining in possession, will not operate as a disseisin of the mortgagee, but will be regarded as improvements made to enhance the value of the equity of redemption.

A mortgagee cannot be disseised by the mortgager.

THIS was trespass *quare clausum* against the defendants, for entering upon the southern part of a mill-dam across Mumford's river in Douglas, cutting away a portion of it, inserting a gate therein and hoisting the same on divers days, thereby causing the water in the mill-pond to escape. The defendants pleaded the general issue, and soil and freehold in themselves. The trial was before *Morton* J.

The parties stated, that their object was, to determine the question of title to that part of the dam, which lay upon the south side of the middle of the river; and all objections to the form of the action were waived. The defendants conceded, that the acts complained of were committed by them.

It was admitted, that in 1803, Samuel Legg was the owner of a farm bounded northerly by the middle of the river; that previously to 1810, he had constructed a dam across the river, placing one end of it on his own land, and extending it to and upon the land of Benjamin Craggin, on the north bank of the river, and had erected a fulling-mill upon Craggin's land, and that this was done with the permission of Craggin.

The plaintiff, to prove his title to the locus, gave in evi-

dence a warranty deed from Legg to Benjamin Adams, dated January 11, 1810, and recorded January 30, 1810, of which the following is an extract: "I do hereby give, grant, sell and convey unto the said Benjamin Adams, his heirs and assigns, a certain building, with a fulling-mill thereon, situate in Douglas aforesaid, on the north side of Mumford's river, on land of Benjamin Craggin Esq., and lies north of the house where the grantor now lives, together with the dam erected across said river and the floom to the south bank of said river, together with all the privileges and appurtenances to the same belonging, or in any wise appertaining." On September 1, 1813, Craggin conveyed an undivided half of the mill, the land around the same and the dam, to Benjamin Adams. On June 1, 1819, Benjamin Adams conveyed one quarter part of the same to John and Josiah Adams, to be held in common with himself and Craggin, in the proportion of one half by Craggin, one quarter by Benjamin Adams, and one eighth each by John and Josiah Adams. On August 30, 1826, Craggin conveyed his half of the premises, including the dam, to Benjamin, John and Josiah Adams, who, on March 3, 1828, mortgaged the estate to John Capron and Sons. On January 19, 1829, the mortgage was assigned by Capron and Sons, to the Blackstone Bank. On September 29, 1830, the bank assigned it to Josiah Chapin, who, on August 24, 1829, had purchased the equity of redemption, at a sheriff's sale made by virtue of an execution against Benjamin and John Adams, the surviving partners of Josiah Adams, then deceased. On September 29, 1830, Chapin conveyed the premises, including the dam, to the plaintiff.

It appeared, that the successive owners of the works upon the north side of the river, had occupied the same from the time of the conveyance of Legg to Adams, and had kept up, during all that time, a head of water by means of the dam ; and that the dam was washed away, and a new one erected on the same site, by Craggin and Adams, about the year 1823.

The title set up by the defendants was as follows.

On April 4, 1803, Legg mortgaged to Nathan Verry, his farm lying upon the south side of the river and bounded by the thread of the stream, to secure the payment of the sum of

$600. On March 15, 1810, Legg's equity of redemption was sold to Asa Thayer, at a sheriff's sale, and on the same day was conveyed to him by the officer who made the sale; but in consequence of a defect in the return on the execution, the title to the equity of redemption did not pass by the deed. On March 24, 1810, Legg quitclaimed the farm, to the thread of the river, to Asa Thayer. On May 28, 1810, Verry commenced a suit against Legg upon the mortgage, to recover possession of the mortgaged premises, and in September 1811, obtained judgment. On December 11, 1811, a writ of possession was issued, and by virtue thereof, possession was delivered to Verry on February 7, 1812, the farm being then occupied by Legg. On May 21, 1812, Verry conveyed the same premises to Asa Thayer by a quitclaim deed in the usual form, containing a covenant, " that neither I, nor my heirs, nor any person claiming from, by, or under me or them, shall have or claim any right," &c. Asa Thayer afterwards conveyed the farm to Amory Thayer, reserving one acre, which included the locus. Upon the death of Asa Thayer in April 1828, this acre of land became the property of Royal and Asa Thayer, who, in September 1829, conveyed the same to the defendants, the deed being delivered upon the locus; which they had entered upon for the purpose.

No evidence was offered by the defendants to show, that any notice had been given to the occupants or claimants of the works on the north side of the river, previously to the time when the plaintiff became a proprietor thereof, that any entry had been made upon the southern part of the dam by any one claiming to own the same.

In order to raise the question of title, the judge ordered a nonsuit, with leave to the plaintiff to move the Court to take off the same and grant a new trial.

*Davis* and *Washburn*, for the plaintiff, cited to the point, that the conveyance from Legg to B. Adams passed a fee in the dam and not an easement merely, *Leonard* v. *White*, 7 Mass. R. 60 ; that the judgment recovered by Verry against Legg was *inter alios*, Legg not being in possession of the locus, and therefore did not bind the plaintiff, *Chase* v. *Hathaway*, 14 Mass. R. 222 ; 1 Stark. on Evid. 192 : that as Adams was

in possession of the dam and wa.er-privilege adversely, at the time of the quitclaim conveyance by Verry to Asa Thayer, the locus did not pass by the deed, whether it be considered as a grant or a release, *Poignard* v. *Smith*, 8 Pick. 272 ; *Russell* v. *Coffin*, 8 Pick. 152 ; that the quitclaim deed of Verry to Asa Thayer operated as a discharge of the mortgage of Legg to Verry, there being a privity of estate between Legg and Thayer, Com. Dig. *Estoppel B ; Wade* v. *Howard*, 6 Pick. 496 ; *S. C.* 11 Pick. 289 ; *Maynard* v. *Hunt*, 5 Pick. 240.

*Hoar* and *Newton*, for the defendants, cited to the point, that the deed from Verry to Asa Thayer was an assignment and not an extinguishment of the mortgage, *Gibson* v. *Crehore*, 3 Pick. 475 ; *S. C.* 5 Pick. 146.

SHAW C. J. delivered the opinion of the Court. The fact averred as a trespass, being admitted, and both parties being desirous that the cause shall be considered and decided upon the general question of title, it has been argued upon that ground, and it has been so considered by the Court. The conveyances set forth in the report, have been so numerous and various, extending through a period of thirty years, that it is somewhat difficult to understand the precise question ; and it requires a careful attention to dates and other particulars, to ascertain what the true questions of law are, and to render them intelligible. The small parcel of land about which the question of title arises, is the southerly half of a mill-dam across a stream known as Mumford's river, in the town of Douglas. Probably the right of soil involves also the water-privilege incident to it, and renders it an object of value. Both parties claim under titles derived from Samuel Legg, and it is conceded by both, that Legg was the undisputed owner of the soil, in 1803.

Legg's farm was situated on the southerly side of the stream, and was bounded of course by the central line, or thread of the stream. There was then no dam at the place. The first conveyance was that from Legg to Verry, in mortgage, to secure $600, by deed dated April 4, 1803. The description was of the whole farm, bounded northerly by the thread of the stream, and of course, large enough to embrace the soil

32 *

*Hunt*
*v.*
*Hunt*

*April term*
1834.

upon which the southerly half of the dam now stands. Legg, the mortgagei, remained in possession several years, and at least until 1810, and during that period built the dam in question. At the time the dam was built, the land on the northerly or opposite bank of the river, was owned by Craggin. Legg built the northerly half of the dam, and also a fulling-mill, on Craggin's land, with his permission. Such was the state of the title, when Legg, by his deed of January 11, 1810, conveyed the fulling-mill to Benjamin Adams, together with the dam erected across said river and the floom, " to the south bank of said river," with the appurtenances. This deed in terms, embracing the whole of the dam, to the south bank, included in its description the southerly half now in question, and this estate passed by Legg's deed to Adams, subject however to the mortgage to Verry. At that time Legg did not profess to own the land on the north side, but described the mill and northerly end of the dam as being on Craggin's land. But Craggin and Adams by several conveyances united their interests, and in regard to the plaintiff's title, without examining all the several steps, it is sufficient to say, that by various mesne conveyances, the estate thus conveyed by Legg to Adams, came to the plaintiff, and if he is not defeated by a title derived under Legg's mortgage to Verry, which was prior in time, he has established his title.

Whether the defendants can trace back their title to the mortgage from Legg to Verry in 1803, so as, in point of time, to overreach the plaintiff's title, is the question between the parties. That title is stated thus. On March 15, 1810, the equity of redemption of Legg, the mortgager, was sold at an officer's sale, but the proceeding being informal, it is conceded that nothing passed, and that may be laid wholly out of the case.

But on March 24, 1810, Legg conveyed the farm to Thayer by a quitclaim deed. This deed embraced the whole farm to the thread of the river, and so was broad enough in its terms, to include the southerly half of the mill dam ; still, that half of the dam could not pass by it, because the same Legg had by his deed several weeks before, conveyed that part of his estate to Adams, who, as between these two

Hunt
*v.*
Hunt.

deeds, had the elder and better title. The defendants, therefore, before they can succeed, must establish a title as derived from the earlier deed of Legg, being his mortgage to Verry.

It appears that Verry commenced a suit on his mortgage, in May 1810, obtained judgment, and had his writ of possession in 1811, and was put into possession by an officer, by force of the writ, in February 1812.

In May 1812, Verry conveyed the same premises to Asa Thayer, by a quitclaim deed, in usual form, with a covenant, that neither he, nor his heirs, nor any person claiming from, by, or under him or them, should have or claim any right, &c. This deed embraced in its description, all that was included in Legg's mortgage to Verry, and of course included the southerly half of the dam, being the place in controversy. Now, if the deed from Legg to Asa Thayer, of May 1810, conveying his equity of redemption, is the foundation of the title claimed under Thayer, and the deed from Verry to Thayer is to be taken as a discharge of the mortgage, it is evident that the title derived through Thayer, commenced at a later period than that derived through Adams, and of course must fail. But if the deed from Verry to Thayer was a good assignment of his mortgage, then the title derived through Thayer is the elder and better title. The great question therefore is, whether the quitclaim deed from Verry to Thayer, with covenants against himself, his heirs, &c., was an extinguishment and discharge of the mortgage, or an assignment and conveyance of the title created by it. This conveyance by Verry to Thayer was executed May 21, 1812, after Verry the mortgagee had been put into possession under his judgment against Legg, and it is stated, in the report, that he thereby conveyed the same premises to Asa Thayer, by a deed of quitclaim, made in the usual form, containing a covenant of warranty against all persons claiming under him or his heirs. By this, we are to understand, that it was a deed given for a valuable consideration, using the terms, "remise, release, and for ever quitclaim" to the releasee, his heirs and assigns, the premises as described in his mortgage deed from Legg

A mortgagee, especially after entry for foreclosure, is considered as having a legal estate, which may be alienated and

transferred, by any of the established modes of conveyance, subject only, until foreclosure, to be redeemed by the mortgager. It seems clear, therefore, that if this had been a deed in the usual form of words, "give, grant, sell and convey, release and quitclaim," and if it is apparent, that it was the intention of the releasor to transfer, and of the releasee to receive the legal seisin, title and interest in the estate, and not to cancel and extinguish the mortgage, the deed would so have operated, to pass the mortgagee's legal title. And we are of opinion, that such is the effect of the deed in the present case.

Courts of law have gone very far in modifying the rules of conveyance, both those of the common law and those which have their effect from the statute of uses, so as to give effect and operation to the deeds of parties, rather according to the manifest intent, than according to the force of the particular words used to effect the conveyance. So that where it is manifest, from the efficient words of conveyance used, that it was intended and understood, that the estate should pass, in one way, as by feoffment, bargain and sale, covenant to stand seised, or release, but some of the circumstances are wanting, which by the rules of law are necessary, to pass the estate in that form, and it cannot so pass, yet if all the circumstances exist, which are sufficient to pass the estate in another form, the Court will construe it to be a conveyance of such form, notwithstanding the words used are not properly adapted to that purpose, so as to give it effect, and cause the estate to pass.

So the common deed of this commonwealth, using the words give, grant, bargain, sell and convey, made to one to the use of another, will be construed to be a feoffment and not a bargain and sale ; if it were construed a bargain and sale, it would raise a use only to the bargainee, and then by the well-known rule of law, no further use could be limited on that use, and the obvious purpose of the conveyance would fail. But by construing it to be a feoffment, a common law conveyance, by which the estate would pass without the intervention of the statute of uses, the use declared upon it would take effect and be executed by the statute. *Thatcher v. Omans,* 3 Pick. 521 This construction was adopted solely in pursuance of

the rule, of giving effect to the intent ; because the words were altogether as apt to create a bargain and sale, as a feoffment.

So a bargain and sale, which could not operate in that form, because it would operate to create a freehold commencing *in futuro*, shall be construed to be a covenant to stand seised to uses, where the intent is apparent, and the consideration is such as to enable a court so to construe it. *Parker* v. *Nichols*, 7 Pick. 111.

In *Welsh* v. *Foster*, 12 Mass. R. 93, the difficulty was, that the deed could not take effect to pass an estate in any form, for want of some of, the requisites adapted to each ; and besides, the deed was to take effect upon a contingency which might not happen within the time limited by law for the .vesting of estates, to prevent the creation of perpetuities.

In an English case, in the time of Lord *Mansfield*, a release was construed to operate as a grant of a reversion, in order to effectuate the intention of the parties. *Goodtitle* v. *Bailey*, Cowp. 597. But we think the point has been settled in this commonwealth by several decisions.

A release to one, not in possession, if made for a valuable consideration, will be construed to be a bargain and sale, or other lawful conveyance, by which the estate may pass. *Pray* v. *Pierce*, 7 Mass. R. 381.

So, a grantee not having been in actual possession of the premises, otherwise than by considering the grantor remaining in possession, as his tenant at will, executed to a purchaser for a valuable consideration a deed of conveyance by release and quitclaim, in the form in common use in Massachusetts, and it was held, that this was a sufficient conveyance to pass the estate, though the releasee had not any previous interest in, or possession of the estate. *Russell* v. *Coffin*, 8 Pick. 143.

Now in the present case, all the circumstances concur, which would be requisite to give the conveyance effect as a bargain and sale. These requisites are, that it must be upon a pecuniary consideration, it must be to the use of the bargainee. and not a third person, to take effect immediately on the execution of the deed ; and it must be enrolled.

It would seem, therefore, within the reason of the author-

ties, that if a grantor has a legal seisin only, and neither the grantor nor grantee has possession, that the estate would pass by a deed of release and quitclaim, where all the requisites exist and appear upon the deed to give it effect as a bargain and sale.

But it is not necessary to maintain the position to this extent in the present case. But supposing actual or constructive possession necessary to give effect to the deed of release and quitclaim, upon a pecuniary consideration, here there was such constructive possession in the releasor, bringing it quite within the authority of the case last cited.

By force of the mortgage deed, the mortgagee becomes seised of the estate, and the mortgager, until discharge or foreclosure of the mortgage, is *quasi tenant at will* of the mortgagee, and so the possession of the mortgager is that of the mortgagee. This brings it precisely within the principle decided in *Russell* v. *Coffin*, where the estate was in the possession of the tenant at will of the releasor, and yet a deed of release and quitclaim, to a stranger, for a valuable consideration, was held to pass the estate.

I have not relied here upon the consideration, that Verry had recovered judgment, and been put into actual possession, under his writ of seisin, which would render the deed of quitclaim conclusive as to all of which he was thus in actual possession ; because, although his suit embraced all the estate included in his mortgage, and the judgment followed the writ, yet I presume Adams was not made party, and, as Legg had conveyed the half of the dam to Adams, prior to this suit, to the extent of that portion of the dam, the judgment on the mortgage, against Legg, may not perhaps be considered binding and effectual, and therefore it may be contended, that the writ of possession executed did not change the relation of Verry, as to that part of the mortgaged premises. I consider it therefore as standing upon the same footing, as the whole of the mortgaged premises did before the suit, when the mortgagee had the legal seisin, and the right of possession, and the mortgager was in the nature of his tenant at will.

Nor, in order to give effect to this quitclaim deed, have I considered Thayer as in possession under his previous deed

of the equity of redemption from Legg; because, as to the dam, Legg had previously conveyed to Adams, so that as to that part of the premises, Legg's deed to Thayer was inoperative and passed nothing, and so as to that, Thayer was not in possession, in virtue of his deed from Legg.

But it has been contended, and upon this the case of the plaintiff mainly rests, that Thayer, having purchased the equity of redemption of Legg, when he subsequently took the quitclaim deed of Verry, must, by operation of law, be considered as having paid and discharged the mortgage, by which the mortgage itself became merged in the equity and extinguished, so that a title can no longer be claimed under it. But we think this position cannot be maintained. We have already stated, that the mortgagee had a perfect right and legal power to assign his mortgage, if he thought fit, and to give to his assignee the same right which he held himself, that is, to receive the amount secured by the mortgage, from any person entitled by contract or by operation of law, to redeem, and to hold the legal estate in security of the debt, till it should be so paid. And we can see no reason why a purchaser of the equity of redemption, whether of a part or the whole of the mortgaged premises, is in any respect disabled from becoming such assignee. He may consider his equity of redemption of no value, or of small value, or the title to it invalid or doubtful; and can there be any reason in law, why he, who has the most urgent occasion for making such a purchase to protect his own interest, should be disabled from doing so, and be placed in this respect in a worse condition than a stranger?

We think this case was considered and settled in the case of *Gibson* v. *Crehore*, 3 Pick. 475, which was in principle like the present. The defendant first purchased the equity of redemption, and then took an assignment, and as against a widow claiming a right of dower, it was held that the mortgage was not extinguished.

We think there is abundant reason why no such merger and extinguishment should take place, by operation of law, against the intent of the parties. Suppose a man in good credit mortgages his real estate to two thirds of the value to A. Subsequently it is attached by B upon a secret attachment, not

known to a subsequent purchaser, or if the mortgager be in failing circumstances, it may be attached upon various or doubtful claims, or claims which may prove to be secured upon other property. Subsequently C purchases the equity of re demption. To protect his own interest he must obtain from the first mortgagee, either an assignment or extinguishment of the mortgage. If the latter, he may let in all the claims of attaching creditors, or second purchasers, and lose all the money he has paid to discharge the mortgage. If the former, then he will stand, as he ought, in the place of the first moitgagee, with an unquestioned title to the extent of the money paid for such assignment, as against all subsequent claimants, so that if they would redeem, they must first repay to him as assignee, the amount of the mortgage, leaving them to stand towards him in his capacity of purchaser of the equity, according to their legal and equitable rights, in exactly the same manner as they would have stood towards the first mortgagee himself. This is doing perfect justice to all parties. Those who have claims subsequent to the mortgage, may, if they have the right and think fit, redeem the mortgage alone, leaving the assignee to his rights as purchaser of the equity.

And so the rule was laid down in the case cited; — "Where a purchaser of a right to redeem, takes an assignment, this shall or shall not operate as an extinguishment of the mortgage, according as the interest of the party taking the assignment may be, and according to the real intent of the parties."

And we think the same result follows from considering the rule of law in relation to merger. In the case cited, it is said that mergers are odious in equity, and shall not be allowed, where the estates may well stand together. Here, we think, that both in law and equity, the estates may well stand together.

In order to effect a merger at law, the right previously existing in an individual, and the right subsequently acquired, in order to coalesce and merge, must be precisely co-extensive, must be acquired and held in the same right, and there must be no right outstanding in a third person, to intervene between the right held and the right acquired. If any of these requi-

sites are wanting, the two rights do not merge, but both may well stand together. But the case we are considering supposes, that a third person has, by operation of law, by purchase or by attachment, acquired certain rights or claims to the equity of redemption, which do not extend to the mortgage. When, therefore, the equity of redemption by purchase, and the mortgage by assignment, vest in the same individual, they do not coalesce, or merge, if there be in a third person, a right of dower, a right acquired by purchase, or a real lien by attachment, intervening between the mortgage and the equity. In such case, therefore, the estates may well stand together, and the mortgage must be kept on foot, to enable such dowress, after-purchaser, or attaching creditor, to enjoy and enforce their respective legal and equitable rights.

We think the present case is entirely within these principles. It is apparent from the form of the deed of quitclaim, from the qualified covenant against incumbrances, and from the manifest object of the parties, that it was the intent of the mortgagee, not to discharge his mortgage, but to sell and transfer his lega title in the mortgaged premises, by the species of conveyanc long known and used in this commonwealth, when the intent is to pass an estate without warranty. As Verry had a good right to assign, as Thayer was capable of receiving, as the form of the deed, in the relation in which the parties stood, was sufficient to effect this transfer, and as it was the intent of the parties, and consistent with the rules of law, that the interest and estate of the mortgagee should pass by the deed, we are of opinion, that it did extend to, and include the small portion of the dam now in controversy.

In taking this view of the subject, a question arose, whether at the time of the quitclaim deed by Verry to Thayer, in 1812, Verry was not disseised, so that no estate passed by his deed. And we think that Verry, the mortgagee, was not disseised. It was held in a late case, that a mortgagee as well as a mortgager, could be disseised by a stranger. But it must be by an actual ouster and exclusive occupation, and not by a qualified and occasional use of the land. *Poignard v. Smith*, 8 Pick. 272.

But it is very clear, that a mortgagee cannot be disseised

by the mortgager; being tenant at will, his possession s **not** adverse. And any buildings, improvements or erections **placed** by the mortgager upon the land, must be considered as im provements upon the estate mortgaged, made by the mortgager as owner of the equity of redemption, and cannot be deemed a disseisin. The mortgager in such case must be considered as making improvements upon his own estate, of which he has the full benefit, in the enhanced value of the equity of redemption. In the present case, the facts show, that after the mortgage by Legg to Verry, the dam was built by Legg himself, some time between the years 1803 and 1810. This erection of the dam, therefore, regarding it as a structure or building like a house, did not operate as a disseisin of the mortgagee, because placed upon the premises by the mortgager. And it does not appear that after the conveyance of this dam, by Legg to Adams, the latter, or any one under him, ever did any act of ownership on that part of the dam, or even ever entered upon it, prior to May 1812, when Verry conveyed to Thayer. There appears then, no building upon the land, no enclosure, none of those acts of actual ouster and exclusive possession, which can be deemed to amount to a disseisin of the mortgagee, except those done by the mortgager, and his acts could not amount to a disseisin. We think, therefore, that Verry was not disseised, when he made his deed to Thayer, and therefore it cannot be objected upon that ground, that nothing passed by the deed.

Another question arose, namely, whether after the old dam was washed away by the floods in 1823, the erection of a new one on the same site, by Craggin and Adams, claiming under an adverse title, was not an ouster of Asa Thayer. But this question has become immaterial, because if these acts did amount to a disseisin, the right of entry remained to Asa Thayer, and, as appears by the statement of facts, duly came to his sons, who seasonably entered upon the premises, and there executed the deed to the defendants, under which they claim. If they had been disseised, this entry vested the seisin in them again; and the deed being delivered by them on the premises, the defendants became seised. We are of opinion, therefore, that the defendants have the better legal

title, coming in as they do by a title derived from the mortgagee ; that the plaintiff, claiming through a deed made by the mortgager, after the mortgage, necessarily took a title subject to the mortgage, and as the mortgage has never been discharged, the defendants have the elder and better title. If the plaintiff has any claim, it must be only an equitable right, a right to redeem ; which depends upon facts and questions not now before the Court, and of which we give no opinion.

*Nonsuit confirmed.*